UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

ZACHARY N. & KIMBERLY A. TROST,

    Debtors.

_____/

Case No. GL 13-05887
Chapter 7

SHERRY TROST,

    Plaintiff,

v.

ZACHARY N. & KIMBERLY A. TROST,

    Defendants.

_____/

Adversary Proceeding
No. 13-80266

**OPINION GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS
MOTION FOR SUMMARY JUDGMENT**

Appearances:

Troy Richmond Hendrickson, Esq., Tempe, Arizona, attorney for Sherry Trost, Plaintiff.

Michael Robert Behan, Esq., Okemos, Michigan, attorney for Zachary and Kimberly Trost, Defendants.

## I. INTRODUCTION & ISSUE PRESENTED.

This adversary proceeding arises from a longstanding family dispute between Sherry Trost (the "Plaintiff") and her stepson and his wife, Zachary and Kimberly Trost, (collectively, the "Defendants").  The dispute involves ownership of videotapes and other memorabilia from a television show, *Michigan Outdoors*, that was created and

operated by Fred Trost ("Fred"), Sherry's husband and Zachary's father.[1]  The Plaintiff alleges that she became the owner of these assets after Fred's death in 2007, and that the Defendants subsequently converted the property to their own use.  Prior to the filing of the Defendants' bankruptcy case, the Plaintiff filed a lawsuit against the Defendants in the United States District Court for the Western District of Michigan (the "District Court action").  A three day jury trial was held in the District Court action, and the Plaintiff obtained a judgment against the Defendants for common law conversion under Michigan law.  The conversion judgment was then affirmed by the Sixth Circuit Court of Appeals.  After the Defendants filed their chapter 7 case, the Plaintiff initiated this adversary proceeding, seeking a determination that the debt arising from the conversion of her property is excepted from the Defendants' discharge under § 523(a)(6) of the Bankruptcy Code.[2]

The sole issue presented is whether the prior federal court judgment finding the Defendants liable for common law conversion is entitled to preclusive effect in this adversary proceeding.  If so, do the factual findings that were actually litigated and necessary to the prior judgment establish that the Defendants' conversion of the Plaintiff's property was willful and malicious under § 523(a)(6)?  Alternatively, does the prior judgment, as alleged by the Defendants, determine that the retention of property was *not* a willful and malicious injury?

---

[1]  Fred Trost was previously a debtor in this court.  A creditor, Buckstop Lure Company, sued Fred and obtained a judgment revoking his chapter 7 discharge.  See Buckstop Lure Co. v. Trost (In re Trost), 164 B.R. 740 (Bankr. W.D. Mich. 1994).  This judgment caused many transfers to be made among and between Fred and the parties in this adversary proceeding.

[2]  The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

## II. JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The case and all related proceedings have been referred to this court for decision.  28 U.S.C. § 157(a); Local Rule 83.2(a) (W.D. Mich.).  This adversary proceeding is a statutory core proceeding.  28 U.S.C. § 157(b)(2)(I) (determinations regarding dischargeability of a debt).  Notwithstanding the holding in Stern v. Marshall, __ U.S. __, 131 S. Ct. 2594 (2011), this court is constitutionally authorized to enter a final order in this adversary proceeding.  See Tibble v. Wells Fargo Bank, N.A. (In re Hudson), 455 B.R. 648, 656 (Bankr. W.D. Mich. 2011) (the Stern decision is extremely narrow; "[e]xcept for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings"); cf. Waldman v. Stone, 698 F.3d 910, 921 (6th Cir. 2012) (bankruptcy court lacks constitutional authority to enter final judgment on debtor's state law fraud claims against creditor).  Because this is a nondischargeable debt action, Stern and Waldman do not govern.

Very recently, the Sixth Circuit issued an opinion, albeit unpublished, that reached the same conclusion.  Hart v. Southern Heritage Bank (In re Hart), __ F. App'x __, 2014 WL 1663029 (6th Cir. Apr. 28, 2014).  Hart buttresses this court's conclusion determining it is empowered to enter a final judgment.

## III. FACTS AND PROCEDURAL HISTORY.

The facts underlying this dispute were stipulated to in the District Court action,[3] and are restated, in relevant part, as follows:

---

[3]     The District Court action is still pending in the United States District Court for the Western District of Michigan under Case No. 1:09-cv-580.  Relevant portions of the record in the

Plaintiff, Sherry Trost, is the widower [sic] of Fred Trost. Fred Trost started a television show in Michigan in 1982, titled Michigan Outdoors. Michigan Outdoors was a dba of Fred Trost Enterprises, Inc. Fred Trost Enterprises, Inc. accumulated significant debts, including, but not limited to, a significant multi-million dollar civil judgment known as the "Buck Stop Judgment." Plaintiff married Fred Trost on July 29, 1988 . . . . The "Michigan Outdoors" tape library owned by Fred Trost Enterprises, Inc. was bought by ZNT Marketing, Inc., a company owned by Zachary Trost and JoAnn Cribley at [t]he auction held when all assets related to the television show were seized due to the Buck Stop Judgment.

Fred Trost continued to operate his show[;] however[,] the debts from Fred Trost Enterprises, Inc. followed Fred Trost and made it impossible for him to own or operate the show in his own name or to own any assets of the show. In fact, Fred Trost was going to have to shut down the show and the business because of the debt. Fred Trost was to receive a significant inheritance from his parents upon their passing[;] however[,] these funds would not be available in time to save the show. Plaintiff and nonparty JoAnn Cribley agreed to take ownership of the show and its assets and agreed to take on the show's debts in their names so that Fred Trost could continue to operate the show. Plaintiff and JoAnn Cribley became officers and owners of Practical Sportsman, Inc.

In 2002, a non-profit corporation, Practical Sportsman Foundation, was set up in order to continue the operation of the show. Again, JoAnn Cribley and Sherry Trost were officers of Practical Sportsman Foundation. Practical Sportsman Foundation took on debts of the previous business entities and incurred additional debt. Fred Trost remained in charge of the running of the business, including finances and bookkeeping.

Plaintiff took a second mortgage on her home so Practical Sportsman Foundation could obtain an operating loan in the amount of $36,000.00. Practical Sportsman Foundation incurred at least $56,797.06 payroll tax liability to the Internal Revenue Service. Plaintiff ultimately paid that tax liability out of her personal funds . . . . She used money from her

---

District Court action, and the subsequent appeal to the Sixth Circuit Court of Appeals, were submitted as exhibits to the Plaintiff's motion for summary judgment in this adversary proceeding. (See AP Dkt. No. 21, 22 & 23.) However, for ease of reference, citations herein shall be directly to the district court's docket, e.g., "USDC Dkt. No. __" or to the written opinion entered by the Sixth Circuit Court of Appeals, Trost v. Trost, 525 F. App'x 335 (6th Cir. May 7, 2013).

The "Uncontroverted Facts" were set forth by the parties in their proposed Final Pretrial Order. (USDC Dkt. No. 69.) The stipulated facts were adopted by the district court in its Order Adopting Final Pretrial Order. (USDC Dkt. No. 81.) The stipulated facts were also quoted in the Sixth Circuit's opinion, see Trost, 525 F. App'x at 337-38.

4

retirement account and incurred additional tax liability for using her retirement funds.

Practical Sportsman Foundation incurred additional tax debt to the [S]tate of Michigan of approximately $16,000 . . . [and] borrowed an additional operating loan of $9,000 to support the show and the business. Because the Plaintiff and JoAnn Cribley were the legal owners and financiers of Practical Sportsman Foundation, they were ultimately liable for the loan and tax debts.

Fred Trost became suddenly ill in May 2007. After several months in the hospital, Fred Trost passed away in July 2007 prior to receiving his inheritance or paying any of the debts from the show.

Defendant Zachary Trost is the son of Fred Trost and [the stepson] of Plaintiff Sherry Trost. Defendant Kim Trost is the wife of Zachary Trost. Zachary Trost worked on the show with his father over the years and he and/or his company owned a museum and published a magazine related to the show.

Fred Trost predeceased one of his parents and never received the inheritance. Zachary Trost and [his sister] Tara Trost received an inheritance from Fred Trost's parents.

(USDC Dkt. Nos. 69 & 81; Trost, 525 F. App'x at 337-38.)

After Fred Trost died in 2007, Sherry Trost agreed to give Zachary Trost the assets she owned relating to Fred's show, including videotapes of show episodes, raw footage, and other show memorabilia. (See Trost, 525 F. App'x at 338.) In exchange, Zachary was to pay off the debts Sherry incurred running the show. (Id.) Zachary took the assets from Sherry, and attempted to profit from them. (Id.) However, over the next two years, he ignored Sherry's repeated requests to pay off the debts. (Id.) When Sherry ultimately demanded that Zachary return the assets, he refused. (Id.)

In June 2009, Sherry Trost filed the District Court action against Zachary and Kimberly Trost. The First Amended Complaint in the District Court action alleged seven

5

counts against the Defendants, including causes of action for breach of contract, fraud, conversion, and statutory conversion. (USDC Dkt. No. 17.)

In February 2012, a three day jury trial was held in the District Court action.[4] Sherry Trost testified during her case-in-chief, along with JoAnn Cribley and two other witnesses. (Trost, 525 F. App'x at 339.) Sherry Trost also offered nearly two dozen exhibits into evidence. (Id.) The testimony and exhibits established that the property at issue included the video library of Fred's show, video editing equipment, show props, wildlife mounts, rifles, shotguns, hunting and fishing equipment, and a shotgun reloading machine. (Id.) The evidence further established that these assets were owned by Sherry Trost. (Id.) According to the testimony at trial, and consistent with the parties' stipulation, the assets were originally purchased by ZNT Marketing, Inc. ("ZNT"), an entity owned jointly by Zachary Trost and JoAnn Cribley, after entry of the Buck Stop Judgment. (Id.) When ZNT encountered financial difficulties, Sherry Trost testified that the assets were transferred to her in exchange for payment of ZNT's debts. (Id.) JoAnn Cribley offered consistent testimony, explaining that she cut the checks to ZNT which resulted in the assets being transferred to Sherry Trost. (Id.)

Sherry Trost also presented evidence at trial about her agreement with Zachary and Kim Trost regarding the videotapes and memorabilia:

> At or near the time of Fred's death, Sherry . . . explained, Zachary offered to pay the debts she incurred over the years to keep the show running in exchange for the video library, the memorabilia and other property related to the show. Sherry said they discussed the offer on

---

[4] In its subsequent written opinion affirming the conversion judgment, the Sixth Circuit provided a detailed analysis and explanation of the factual findings from the trial. (See Trost, 525 F. App'x at 337-41.) The Sixth Circuit's factual summary is binding on this court and is entirely consistent with the findings of the trial court. (See Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law, USDC Dkt. No. 88, at 16-19.) Accordingly, citations herein are to the facts as recited in the Sixth Circuit's opinion.

6

several occasions and that she accepted it. She never put the agreement in writing, though, because she did not think it was necessary to do so with someone she considered her son.

Others knew of the arrangement, too. JoAnn testified that she attended a dinner after Fred passed away where Zachary said he wanted to protect his father's legacy and would pay the show's debts in exchange for the property. Jason Marshall, Sherry's son and Zachary's stepbrother, also told the jury that he discussed the debts and the agreement with Zachary while Fred was in the hospital. And Deborah Guinn, Sherry's former sister-in-law, testified that she spoke with Zachary about taking care of the show's debts after Fred died.

Sherry kept the property at issue in a storage unit and in her home. In July 2007, after Sherry gave Zachary the key to the storage unit, he took the items from both locations to the home he and Kim shared. In the months that followed, Sherry repeatedly tried to speak with Zachary about paying the debts. But he would not return her calls. Sherry also tried communicating with Zachary via email. In one message, dated September 11, 2008, she suggested that she "would not object (and neither would Fred) to selling the tape library, [Fred's] guns and other assets to help pay off the debts." Zachary responded five days later: "Let me know how and when you would like to 'take back' the guns and video library . . . I have spoke [sic] to the family and if you are able to determine a fair market value on the video library, the family might be interested in purchasing it." Through counsel, Sherry later demanded that Zachary return her property, but he never did.

JoAnn also corresponded with Zachary on numerous occasions about the agreement he made with Sherry. The emails they exchanged reflect Zachary's efforts to raise money by selling videos and memorabilia to Fred's fans. He hoped, for example, to "maximize the possible sales" of the tapes, and related that his "plans all along have been to use some of that revenue to help the cause." Zachary's emails further indicated his intent to "help [JoAnn] and Sherry out" and documented his travails to [get] his sister, Tara to pitch in. They also make plain that he was directly involved in dealing with Sherry's IRS debts. Zachary hired a lawyer to "handle dealing with the IRS on Sherry Trost and JoAnn Cribley's behalf." Zachary wrote to the lawyer: "We would like your firm to try to make a settlement, (hopefully eliminating penalties and interest and getting it lowered as much as possible considering the current situation) and resolve their tax problems."

(Id. at 339-40.)

After the conclusion of the Plaintiff's case-in-chief, Zachary and Kim Trost rested their case without testifying or providing any other evidence or witnesses. (Trost, 525 F. App'x at 340.) (Why they did this is curious to this court, but they did.) Instead, they filed a motion for judgment as a matter of law under FED. R. CIV. P. 50(a). The district court took the motion under advisement, and submitted the case to the jury.

The jury instructions defined common law conversion as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." (USDC Dkt. No. 72 at 34.) The jury instructions further explained that:

> Plaintiff claims the Defendants Zachary and Kim Trost converted her property by obtaining that property through deceit and/or false representations. To establish this Plaintiff has the burden of proving that Defendant or Defendants obtained Plaintiff's property by deceit or false representations.

(Id.) The jury was instructed to enter a verdict for the Plaintiff on the common law conversion claim if the Plaintiff proved each of these elements by a preponderance of the evidence. (Id.)

The jury determined that Zachary and Kimberly Trost had converted the Plaintiff's property, and entered a judgment for $108,797.06 plus costs and attorney fees against each Defendant on the conversion count. (USDC Dkt. No. 86.)[5] The jury also found that Zachary Trost breached his contract with the Plaintiff, and awarded $194,725.30 plus attorney fees and costs on the breach of contract claim. (Id.) Finally, the jury determined that Zachary Trost did not defraud the Plaintiff. (Id.)

---

[5] The Jury Verdict is also attached as Exhibit B to the Defendants' cross motion for summary judgment in this adversary proceeding. (AP Dkt. No. 11.)

After entry of the jury verdict, the district court issued an Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law. (USDC Dkt. No. 88.) In its order, the district court upheld the jury verdict on the Plaintiff's conversion claim. (Id. at 16-19.) After reciting the legal standard for common law conversion, the district court held that the evidence at trial was sufficient to establish that Sherry Trost was the owner of the property. (Id. at 17-18.) In support of this conclusion, the court cited the testimony regarding Sherry Trost's acquisition of the property, and Zachary Trost's email offers to purchase or return the property after he took possession of it. (Id.) The court further explained:

> Zachary and Kim Trost sat in the courtroom throughout the trial and neither ever too[k] the witness stand to testify that they owned this property or believed Sherry did not. Viewing the evidence in the light most favorable to the non-moving party (Sherry Trost), the jury could certainly accept the testimony of Sherry Trost and JoAnn Cribley that MSDA and/or Fred Trost purchased the video tape library from ZNT and that Sherry Trost received the video tape library as part of that transaction, and that *everyone involved believed Sherry owned the video library and memorabilia.*

(Id. at 18 (emphasis added.)) The district court also found that the evidence was sufficient to establish that both Zachary and Kim Trost converted the Plaintiff's property. (Id. at 18-19.) The court explained:

> [The Defendants] initially took possession of the property with Sherry's blessing. This was essentially Zachary's project, but as the e-mail exhibits suggest, Kim Trost, as Zachary's wife and a part of the "family," was fully aware of what was happening. Zachary, e.g., e-mailed JoAnn Cribley on July 25, 2008 that, "Kim and I are still planning to help you and Sherry out." [citation omitted]. The evidence also shows that Zachary continued to hold and exercise control over the property in their home, and neither one returned any of it, despite demands by both Sherry and her attorney, even up to the time of trial. Rather, they stopped talking to Sherry. This behavior constituted conversion as defined above, and significantly, neither Zachary nor Kim took the stand to deny it. Based on the testimony and exhibits Sherry Trost produced, there was a sufficient

9

basis for the jury to make a finding of common law conversion against Zachary and Kim Trost.

(Id.)  Accordingly, the district court denied the Defendants' motion for judgment as a matter of law on the common law conversion claim.  The court also granted Zachary Trost's motion as to the breach of contract claim and vacated the $194,725.30 judgment against him.  Based upon the factual record at trial, the district court entered a judgment for common law conversion in the amount of $108,797.06 against the Defendants on March 8, 2012.  (USDC Dkt. No. 89.)

Zachary and Kim Trost appealed denial of their motion for judgment as a matter of law on the conversion claim to the Sixth Circuit Court of Appeals.  On appeal, the Defendants raised four issues with regard to the conversion judgment, all of which were rejected by the Sixth Circuit in a written opinion dated May 7, 2013.  (Trost, 525 F. App'x at 341-44.)  First, the Defendants argued that the videotapes were not chattel that could be subject to conversion because the imagery on the tapes was intellectual property.  The Sixth Circuit summarily rejected this argument, holding that video tapes "are obviously chattels that can be converted."  (Id. at 341.)  The court explained that Zachary and Kim Trost "hauled away personal items that belonged to Sherry, and stored them in their home and a storage unit."  (Id. at 342.)  "When Sherry Trost demanded that they return her property, she tried to get back the very same boxes of videotapes and memorabilia."  (Id.)  The Defendants' argument that the property was intellectual property, and not chattels, failed.

Next, the Defendants argued that Sherry Trost failed to establish that she was the owner of the videotapes and show memorabilia.  The Sixth Circuit rejected this argument as a "red herring."  (Trost, 525 F. App'x at 342.)  The court noted that the

10

"parties stipulated that Fred could not and did not own any property related to the show" and that "Sherry and JoAnn took 'ownership of the show,' including its assets and debts." (Id.)   Zachary and Kim Trost presented "no evidence to the contrary."   (Id.) The court also explained that the evidence at trial regarding "when and how" Sherry Trost came to own the property was "more than sufficient to support the jury's verdict." (Id.) The court explained:

> JoAnn [Cribley] specifically said that she cut checks to ZNT, the entity she and Zachary controlled, to transfer the video library and other property to Sherry.   No witness disputed Sherry's ownership, and each one corroborated that Zachary and Kim took the property from Sherry. Moreover, the jury was presented with Zachary's email to Sherry offering to buy the video library from her and asking her "how and when" she would like to take back the property.  Based on this evidence . . . the jury stood on firm ground in concluding that Sherry owned the video library and memorabilia.

(Id.)

Third, the Defendants argued that Sherry Trost failed to offer sufficient evidence to establish the value of the property.  Again, the Sixth Circuit rejected this argument. The court held that "it was appropriate for the jury to set the value of the property when it was converted by the amount of the debts that Zachary agreed to pay in exchange for it." (Trost, 525 F. App'x at 343.)  The court also noted that, "[i]f anything stood in the way of a precise value calculation, it was the couple's [Zachary and Kimberly Trost's] possession of the assets and undisputed refusal to give them up." (Id.)

Finally, the Defendants argued that the conversion judgment should be set aside as to Kim Trost, because there was "no evidence that she participated in any wrongdoing." (Trost, 525 F. App'x at 343.)  The Sixth Circuit disagreed.  The court explained that the record established that:

11

Kim participated in taking Sherry's property, equally possessed it in her home, knew that Sherry demanded its return, and aided in the refusal to comply. Sherry testified that Kim helped her husband move the property to their home. Kim knew that she and Zachary had property for which Sherry expected payment, but explained to JoAnn that stock market losses made it difficult to come up with the money. Kim also confirmed Zachary's aim to honor the agreement in emails to JoAnn. Later, when Sherry's attorney sent a written demand to their home seeking return of the property, neither Zachary nor Kim responded. And in spite of being sued almost three years before the jury was impaneled, the property remained in their joint home. The jury's verdict as to Kim easily stands.

(Id.)

The Sixth Circuit also reversed the district court's ruling on the Plaintiff's breach of contract claim, holding that "the jury was given more than enough evidence to decide the parties entered into a contract that Sherry performed." (Trost, 525 F. App'x at 346.) The Sixth Circuit remanded the case to the district court for reinstatement of the jury's verdict. (Id.) In so doing, the court noted that, because the damages for the breach of contract and conversion claims were "coextensive," the Plaintiff would be required to elect her remedy between the two theories on remand to "avoid double recovery."[6] (Id.)

On July 23, 2013, Zachary and Kim Trost filed a voluntary chapter 7 petition in this bankruptcy court. Sherry Trost filed this adversary proceeding on October 8, 2013. (AP Dkt. No. 1.) The complaint alleges that the debt owed under the judgment in the District Court action should be excepted from discharge because it resulted from the Defendants' fraud under § 523(a)(2) or constituted a willful and malicious injury to the Plaintiff's property under § 523(a)(6). The complaint also seeks denial or revocation of

---

[6]     This court's review of the district court's docket disclosed that the Plaintiff has filed an election of remedies and has sought entry of a judgment on remand, notwithstanding the Defendants' bankruptcy case and the applicability of the automatic stay. The Sixth Circuit held that a conversion occurred, and that conclusion is binding on this court. Neither the remand for a determination of damages, nor the Plaintiff's attempts to have a judgment entered, affect this court's analysis of the preclusive effect of the prior judgment. See note 9, infra. That being said, all parties are cautioned not to violate the automatic stay.

the Defendants' discharge under § 727(a) or dismissal of the Defendants' bankruptcy case for lack of good faith.

On February 1, 2014, the Plaintiff filed a motion for summary judgment only on the § 523(a)(6) count of her complaint. (AP Dkt. No. 10.) The Defendants filed a cross motion for summary judgment on all counts of the Plaintiff's complaint on February 1, 2014. (AP Dkt. No. 11.) On February 28, 2014, this court entered an order scheduling a hearing on the cross motions for summary judgment solely on the § 523(a)(6) count. (AP Dkt. No. 13.) The hearing was held before this court on March 21, 2014. At the hearing, the court heard oral argument from both parties, then took the matter under advisement.

## IV. DISCUSSION.

A. *Summary Judgment Standard.*

Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. BANKR. P. 7056(a). The court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).

The initial burden to demonstrate the absence of a genuine dispute of material fact is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Upon such a showing, the burden shifts to the non-moving party to

present specific facts demonstrating that there is a genuine dispute of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986). All facts and related inferences are to be viewed in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. However, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

B. *Section 523(a)(6) – Willful and Malicious Injury.*

The Plaintiff asserts that the judgment debt owed to her by the Defendants for their conversion of the videotapes and other memorabilia from Fred Trost's television show is nondischargeable under § 523(a)(6). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor[s] to another entity or to the property of another entity." § 523(a)(6). The statute requires that the alleged injury be both willful and malicious for the debt to be nondischargeable. Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463 (6th Cir. 1999). The Plaintiff bears the burden of establishing both elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

For purposes of § 523(a)(6), willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998) (emphasis in original). Thus, a

14

willful injury is one where the debtor "'desires to cause [the] consequences of his act, or . . . *believes that the consequences are substantially certain to result from it.*'" In re Markowitz, 190 F.3d at 464 (quoting Restatement (Second) of Torts § 8A (1964) (emphasis added)). An injury is "malicious" under § 523(a)(6) when the debtors act "in conscious disregard of [their] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986); Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (Bankr. 6th Cir. 2004).

The Plaintiff argues that the facts necessary to establish "willful and malicious injury" under § 523(a)(6) were actually litigated and necessarily determined in the District Court action and were affirmed by the Sixth Circuit in the subsequent appeal. Accordingly, the Plaintiff asserts that, based upon collateral estoppel, she is entitled to a nondischargeable debt judgment as a matter of law. Defendants, in their cross motion, assert to the contrary.

C. *Preclusive Effect of Prior Federal Judgment.*

Collateral estoppel, also referred to as issue preclusion, "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 461 (6th Cir. 1999) (quoting Sanders Confectionery Prods., Inc. v. Heller Financial, Inc., 973 F.2d 474, 480 (6th Cir. 1992)) (additional citations omitted). The United States Supreme Court has explained that "the whole premise of collateral estoppel is that once an issue

15

has been resolved in a prior proceeding, there is no further factfinding function to be performed." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 336 n.23, 99 S. Ct. 645, 654 (1979).  When the requirements of collateral estoppel are met, application of the doctrine "encourage[s] the parties to present their best arguments on the issues in question in the first instance and thereby save[s] judicial time." Spilman v. Harley, 656 F.2d 224, 228 (6th Cir. 1981), overruled on other grounds, Bay Area Factors v. Calvert (In re Calvert), 105 F.3d 315, 319 (6th Cir. 1997). *If a party decides not to present facts or their best arguments at trial, adverse collateral estoppel consequences may result in subsequent bankruptcy litigation.*

When considering the preclusive effect of a prior federal judgment, this court applies the federal law of preclusion.[7] See J.Z.G. Resources, Inc. v. Shelby Ins. Co., 84 F.3d 211, 213-14 (6th Cir. 1996) (applying federal res judicata principles to determine preclusive effect of prior federal judgment and noting that res judicata comprises two doctrines, claim preclusion and issue preclusion); In re John Richards Homes Bldg. Co., LLC, 404 B.R. 220, 237 (E.D. Mich. 2009) ("A federal court applies federal law in determining the preclusive effect of a prior federal judgment."); Restatement (Second) of Judgments § 87 ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court.").  The Sixth Circuit Court of Appeals has stated that issue

---

[7]    The court notes that the result in this adversary proceeding would be the same, even if Michigan law were applied to determine the preclusive effect of the prior judgment.  See McCurdie v. Strozewski (In re Strozewski), 458 B.R. 397, 404 (Bankr. W.D. Mich. 2011) ("Under Michigan law, collateral estoppel precludes re-litigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding resulted in a valid, final judgment and the issue was (1) actually litigated and (2) necessarily determined.") (citing People v. Gates, 452 N.W.2d 627, 630, 434 Mich. 146, 154-55 (1990)).

preclusion under federal law "requires that the precise issue in the later proceedings have been raised in the prior proceeding, that the issue was actually litigated, and that the determination was necessary to the outcome."[8] Spilman, 656 F.2d at 228 (citations omitted). When these requirements are met, "there is no reason to allow relitigation of facts previously litigated which were necessary to the outcome of the prior litigation." Id.

In this adversary proceeding, there is no question whatsoever that the Plaintiff's conversion claim, and the factual issues related thereto, were actually litigated. The jury in the District Court action entered a verdict in favor of the Plaintiff on her common law conversion claim. That verdict was upheld by the district court in its Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law. The district court's order was, in turn, affirmed by the Sixth Circuit Court of Appeals. The Plaintiff's conversion claim has been thoroughly – perhaps more than exhaustively – litigated.[9]

---

[8]    Mutuality of parties to the two proceedings was formerly a requirement, but "is no longer necessary in some circumstances." Spilman, 656 F.2d at 228 (citations omitted). The Plaintiff and the Defendants in this adversary proceeding were also the parties to the District Court action. There is no question that the mutuality requirement is satisfied.

[9]    Although the issue was not raised by the parties in this adversary proceeding, the court notes that the Sixth Circuit opinion remanded the case to the district court for reinstatement of the jury verdict on the Plaintiff's breach of contract claim. On remand, the Sixth Circuit instructed the Plaintiff to elect her remedy between the breach of contract and conversion claim, to avoid an impermissible double recovery. As of the time the Defendants' bankruptcy case was filed, the district court had not yet entered a judgment on remand. However, this court finds that the remand to the district court does not defeat the finality of the judgment on the Plaintiff's conversion claim for preclusion purposes. See generally 18A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 4434 (2d ed.) (explaining that issue preclusion may apply to "determinations of liability that have not yet been completed by an award of damages or other relief").

17

The Defendants argue, however, that the precise factual issues required to establish nondischargeability under § 523(a)(6) were neither raised, nor necessary to the outcome, in the District Court action for common law conversion. The Defendants base their argument primarily on the differing legal standards that apply to "willful and malicious injury" under § 523(a)(6) and conversion under Michigan law.

Under Michigan law, "conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."[10] Foremost Ins. Co. v. Allstate Ins. Co., 486 N.W.2d 600, 606, 439 Mich. 378, 391 (1992) (citations omitted). It is generally "viewed as an intentional tort in the sense that the converter's actions are willful." Id. However, common law conversion can also "be committed unwittingly if [the converter is] unaware of the plaintiff's outstanding property interest." Id.

By contrast, a finding of "willfulness" under § 523(a)(6) requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998) (emphasis in original). Thus, the Defendants are correct that the legal standard for common law conversion differs slightly from the "willfulness" standard under § 523(a)(6). In some instances, conversion under Michigan law may be committed unwittingly, whereas § 523(a)(6) requires evidence that the debtor intended to cause injury, i.e., that he either "desire[d] to cause [the] consequences of his act, *or . . . believe[d] that the*

---

[10]    This was the legal standard applied to the Plaintiff's common law conversion claim by both the district court, see Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law, USDC Dkt. No. 88 at 16, and the Sixth Circuit Court of Appeals, see Trost v. Trost, 525 F. App'x 335, 341 (6th Cir. May 7, 2013).

18

consequences [were] substantially certain to result from it." In re Markowitz, 190 F.3d at 464 (citation omitted and emphasis added).

Despite this technical distinction, collateral estoppel precludes relitigation of *factual* issues that were actually and necessarily determined in the prior action. Montana v. United States, 440 U.S. 147, 153, 99 S. Ct. 970, 973 (1979) (Under the doctrine of collateral estoppel, a "right, question *or fact* distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot by disputed in a subsequent suit between the same parties or their privies.") (emphasis added); In re Markowitz, 190 F.3d at 461. In this case, nothing in the factual record suggests that the Defendants were unaware of the Plaintiff's interest in the property or that their conversion of the Plaintiff's property was merely "unwitting." To the contrary, the factual findings that were necessary to the prior determination that the Defendants converted the Plaintiff's property convincingly establish that the Defendants' actions were also willful and malicious under § 523(a)(6).

Specifically, the facts established at trial in the District Court action, and affirmed on appeal, proved that Sherry Trost acquired ownership of the videotapes and show memorabilia after Fred Trost's death. The parties stipulated that Sherry Trost and JoAnn Cribley generally "took ownership of the show and its assets" after Fred Trost encountered financial difficulties. At trial, Sherry Trost and JoAnn Cribley also testified about how and when Sherry Trost purchased the videotapes and other assets from ZNT, the entity owned by Cribley and Zachary Trost. The Sixth Circuit held that this

19

evidence was "more than sufficient" to support the conclusion that the Plaintiff owned the property at issue. Trost v. Trost, 525 F. App'x 335, 342 (6th Cir. May 7, 2013).

The evidence in the District Court action also conclusively established that Zachary and Kim Trost were aware that Sherry Trost owned the assets. Several witnesses testified at trial that Sherry and Zachary Trost entered into an agreement whereby Zachary would pay off the debts from Fred Trost's television show in exchange for the tapes and other memorabilia. Trost, 525 F. App'x at 339. Although Zachary and Kim Trost took possession of the property, they reneged on their promise to pay the show's outstanding debt. Id. at 339-40. Thereafter, several emails from Zachary Trost documented his offers to either return the property to Sherry Trost, to purchase the property from her, or to sell the assets to "help the cause." Id. The facts also established that Kim Trost "knew that she and Zachary had property for which Sherry expected payment." Id. at 343. As the District Court succinctly stated, "everyone involved" – including Zachary and Kim – "believed Sherry owned the video library and memorabilia." Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law, USDC Dkt. No. 88 at 18.

Finally, the uncontroverted evidence established that Zachary and Kim Trost took possession of the videotapes and other assets, and continued to exercise dominion and control over the assets, despite their awareness of the Plaintiff's ownership interest in the property and her repeated demands for its return. The Defendants took the property, initially with the Plaintiff's permission, from the Plaintiff's home and a storage unit, and moved it to their home. Trost, 525 F. App'x at 339, 342. Thereafter, Zachary

20

Trost continued to hold and exercise control over the assets, ignoring the Plaintiff's requests for payment and demands for the property's return. Id. at 339-40. Kim Trost also "participated in taking [the] property, equally possessed it in her home, knew that Sherry demanded its return, and aided in the refusal to comply." Id. at 343.

This factual record, viewed in its entirety, mandates the factual and legal conclusion that the Defendants' conversion of the Plaintiff's property was "willful" for purposes of § 523(a)(6). See Spilman, 656 F.2d at 228 (When determining the preclusive effect of a prior judgment "the bankruptcy court should look at the entire record of the state [or federal] proceeding."). The Plaintiff owned the videotapes and other assets. The Defendants knew that the Plaintiff owned the assets. Despite this knowledge, and the Plaintiff's demands for return of the property, the Defendants continued to possess the property in derogation of the Plaintiff's rights. This was not in any sense an "unwitting" conversion. The Defendants' conversion of the property was substantially certain to cause injury to the Plaintiff. The conversion was also malicious, because the Defendants retained the Plaintiff's property "without just cause or excuse."[11]

To the extent the Defendants may have believed they had an ownership interest in the videotapes and memorabilia that was superior to the Plaintiff's interest, or were otherwise "unaware" of the Plaintiff's interest in the property, they had a full and fair

---

[11]    Although the Defendants now raise some new asserted facts in their paperwork to attempt to justify relitigation, none of those asserted facts were placed before the jury in the federal trial; it appears that the Defendants chose not to assert the facts to the jury or only now belatedly seek to avoid the consequences of the jury's findings of fact.

21

opportunity to present evidence of that belief in the District Court action.   They did not do so, despite the fact that the parties' competing interests in the assets were *directly at issue* in the conversion claim.   Instead, they stipulated before trial that Sherry Trost and JoAnn Cribley took "ownership" of Fred Trost's television show, and all of its assets and liabilities.  When Sherry Trost and JoAnn Cribley offered more detailed testimony at trial about how Sherry Trost acquired the tapes and other assets from ZNT, the Defendants offered no evidence to contradict that testimony.   If they were truly not aware that Sherry Trost owned the property, the Defendants offered no explanation why Zachary Trost offered to return or purchase the property in his email correspondence.[12] Likewise, the Defendants offered not one whiff of "just cause or excuse" to explain why they failed to return the property to the Plaintiff, even after her repeated demands culminated in the filing of the District Court action, a three day jury trial, and a subsequent appeal.  The facts were conclusively established in the District Court action, and collateral estoppel precludes the Defendants from relitigating these issues in this adversary proceeding.

---

[12]     Even in this adversary proceeding, the Defendants have offered little asserted evidence that their conversion of the Plaintiff's property was unintentional or unwitting.  In fact, the only evidence cited by the Defendants in support of their assertion that they lacked the requisite intent under § 523(a)(6) is an excerpt of testimony in the District Court action, suggesting Zachary Trost suffered mental issues around the time of his father's death.  See Defendants' Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment, AP Dkt. No. 11, Exh. C.  This evidence is insufficient to create a genuine issue of material fact on the issue of intent or to overcome the jury's findings.

## V. CONCLUSION.

For the foregoing reasons, the Plaintiff's motion for summary judgment on Count II of her complaint in this adversary proceeding is GRANTED, and the Defendants' cross motion for summary judgment on Count II of the complaint is DENIED.  The Plaintiff's judgment for common law conversion, in the amount of $108,797.06, that was entered in the District Court action is nondischargeable under § 523(a)(6).[13]  A separate judgment shall be entered accordingly.

Dated this 12th day of May, 2014
at Grand Rapids, Michigan

Honorable James D. Gregg
United States Bankruptcy Judge

---

[13]   As everyone knows, the conversion judgment in the District Court action was affirmed on appeal by the Sixth Circuit.  The Sixth Circuit also remanded the case for entry of a judgment on the Plaintiff's breach of contract claims, instructing the Plaintiff to elect her remedies as between the two causes of action to avoid an impermissible double recovery.  Although the Defendants filed their bankruptcy case prior to the district court entering a judgment on remand, this court notes that the damages for *breach of contract* are dischargeable in the Defendants' bankruptcy case.  Entry of a new judgment in the District Court action is not necessary because this court has jurisdiction to enter a money judgment for the Defendants' conversion in conjunction with determining the dischargeability of the debt.  See Longo v. McLaren, 3 F.3d 958, 965 (6th Cir. 1993) (The "bankruptcy court has jurisdiction to adjudge the validity and amount of a claim together with its dischargeability.").  The conversion judgment damages are nondischargeable; the duplicative breach of contract damages are dischargeable.

23